**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-50975

_____

UNITED STATES of AMERICA,

Plaintiff-Appellee,

VERSUS

NATHANIEL JONES, III,
and
ALBERT CHEVALIER,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Western District of Texas
(W-97-CR-28-1)

_____

February 2, 1999

Before JONES, SMITH, and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Nathaniel Jones, III, and Albert Chevalier appeal their sentences for violations of federal counterfeiting laws pursuant to 18 U.S.C. §§ 371 and 472. Jones also appeals his conviction, claiming insufficient evidence to convict him of one count of conspiracy to violate counterfeiting laws. Finding no reversible error, we affirm.

I.

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

This is not Jones's first experience with counterfeiting. On July 28, 1996, he was arrested after passing several counterfeit bills at a Houston night club. The next day, the police stopped his unindicted co-conspirator, Greg Brookins,[2] for a traffic violation and found him in possession of counterfeit bills, a paper cutter, 100% cotton bond paper, razor blades, and a ruler. The counterfeit bills found on Brookins and Jones had a related origin.

During that same month, defendants passed counterfeit bills to one of their neighbors, Wallace Graham. While in Graham's presence, they discussed their plan to make counterfeit bills using a personal computer, but they lamented that they did not have enough money to purchase a computer. After this conversation, Graham contacted the Secret Service, which began surveillance of Chevalier and arrested him after their surveillance revealed that he possessed $1,000 in counterfeit bills. Chevalier admitted that he and Brookins had made roughly $15,000 in counterfeit money.

Several months later, Jones (with Chevalier in the passenger seat) attempted to pass a fake $20 bill at a Texas Burger drive-through window. The employee recognized that the bill was counterfeit and informed the police. Realizing that something was wrong, Jones began tapping on the restaurant window while yelling at the employee to return the bill. After waiting a few moments, Jones drove off without securing the bill or receiving his food order. As defendants were exiting the restaurant, the police

[2] Brookins was not indicted with appellants because he pleaded guilty to counterfeit charges resulting from his Georgia arrest.

pulled them over and began questioning them and noticed a Texas Burger bag, containing a sandwich, on the front seat. Apparently, defendants had obtained the bag containing the sandwich when, earlier that same day, they had successfully passed a counterfeit $20 bill at a different Texas Burger. The serial numbers on the counterfeit bills at both Texas Burger restaurants were identical.

After checking the car's registration, the police learned that Brookins was responsible for paying the auto insurance. While defendants were being detained, Brookins arrived in a separate car and told the police that defendants were driving the car for him. Although defendants were arrested, the same car surfaced again a few days later when Brookins was stopped and arrested in Georgia for possessing $8,000 in counterfeit money.

## II.

Jones argues that the evidence, while sufficient to show that he violated the law, was insufficient to sustain the verdict tying him to the counterfeit conspiracy. According to Jones, the evidence was insufficient because (1) the serial number on the bill he attempted to pass at the Texas Burger did not match any serial numbers on currency seized in July 1996 from Chevalier and Brookins in Houston; (2) there was no evidence that he knew the bill he passed was counterfeit; and (3) Graham's testimony seldom mentions Jones, because Graham was primarily associated with Chevalier.

We review sufficiency of the evidence arguments in the light

3

most favorable to the verdict and will affirm if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979). To establish a conviction for conspiracy to violate counterfeit laws, the government had to prove that (1) Jones agreed with another person to pursue the unlawful objective; (2) he voluntarily agreed to join the conspiracy; and (3) one of the members of the conspiracy performed an overt act in furtherance of the conspiracy. *See United States v. Cihak*, 137 F.3d 252, 259-60 (5th Cir.), *cert. denied*, 119 S. Ct. 118, *and cert. denied*, 119 S. Ct. 203, *and cert. denied*, 119 S. Ct. 203 (1998). Although the elements can be inferred from circumstantial evidence, mere presence at the crime scene or association with participants is not enough to establish guilt. *See United States v. Velgar-Vivero*, 8 F.3d 236, 241 (5th Cir. 1993).

There is sufficient evidence to support Jones's conspiracy conviction. From Graham's testimony, the jury could reasonably infer an agreement regarding defendants' passing of counterfeit money and their plans to use a personal computer to make counterfeit money. Jones's actions at the drive-through window also show evidence of an agreement and an overt act. Although Jones argues he did not know the bill was fake, when he noticed the Texas Burger employee stalling he began yelling for the employee to return the bill in exchange for three $1 bills. He fled the scene without securing his money or his order. When the police stopped him moments later, they found a Texas Burger bag with a sandwich in

4

itSSpresumably the product of his successful passing of another $20 bill (with the same serial number) earlier that same day. There was also evidence of an agreement among Jones, Chevalier, and Brookins because, according to the testimony of a Secret Service agent, all three were found in possession of bills with the same serial number, and Graham testified that the three frequently traveled together. From all this, the jury reasonably could infer that Jones was an active participant in the conspiracy with Chevalier and Brookins.

## III.

Jones argues that the district court erred in denying his motion *in limine* seeking the exclusion of evidence about Brookins's arrest in Georgia. Evidentiary rulings are reviewed for abuse of discretion. *See United States v. Franklin*, 148 F.3d 451, 458 (5th Cir. 1998). Even if error existed, the ruling will not be reversed if it was harmless. *See United States v. Lowrey*, 135 F.3d 957, 959 (5th Cir. 1998). "A nonconstitutional trial error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Jones argues that he was not associated with Brookins and that Brookins's arrest in Georgia was not related to his case. The evidence, however, demonstrates that the district court did not abuse its discretion. Jones, Chevalier, and Brookins were found with counterfeit money bearing the same serial number. When Jones

5

was pulled over after the Texas Burger incident, the police discovered that Brookins was responsible for paying insurance on the car; Brookins appeared on the scene and told police that Jones was driving his car. Brookins's arrest in Georgia, where police uncovered the $8,000 in counterfeit currency, occurred just days later while he was driving the same car Jones was driving at the Texas Burger.

Jones next argues that any association between him and Brookins ceased upon Jones's arrest and incarceration. A defendant is presumed to continue involvement in a conspiracy and is responsible for continued acts of co-conspirators, even after his arrest, unless he has affirmatively withdrawn from the conspiracy. *See United States v. Puig-Infante*, 19 F.3d 929, 945 (5th Cir. 1994). "Because a defendant's incarceration is not an affirmative act on the part of a defendant, it cannot, by itself, constitute withdrawal or abandonment." *Id.*

Jones did nothing affirmatively to withdraw from the conspiracy. To the contrary, he furthered the conspiracy while in prison by writing letters to Chevalier persuading him to take the blame for their counterfeiting. Therefore, we hold that the district court did not abuse its discretion in denying Jones's motion *in limine*.

IV.

Jones contends that the district court erred in applying a two-level adjustment for obstruction of justice. We review the

6

district court's interpretation of the sentencing guidelines *de novo* and its findings of fact for clear error. *See United States v. Greer*, 158 F.3d 228, 233 (5th Cir. 1998). Section 3C1.1 of the sentencing guidelines provides for a two-level increase "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." Comment 3(b) lists several examples of covered conduct, including "committing, suborning, or attempting to suborn perjury."

In Chevalier's initial statement, he told the police that he was not involved in the counterfeit ring. While the defendants were incarcerated, however, Jones sent several notes to Chevalier asking him to take responsibility and to deny Jones's involvement. In one note, Jones wrote,

> Ted [Chevalier], you have got to tell them that I didn't know because they could give me three time loser which starts at number 25. Please Ted don't let me get three strikes like this . . . . I need you to write a sworn statement saying I didn't have any knowledge that I was only driving . . . .

Later, he wrote a second note stating,

> I asked you to please tell them I had no knowledge of that shit that I was just driving, if not, they're going to try me as a three time loser . . . . On the other hand, if you tell them I didn't know you will have to take the case which would get you two to three if found guilty of knowing it was fake. . . . If you sign a statement saying I didn't know they'll have to let me go.

Finally, Jones sent a third note to Chevalier with a written statement on it that Chevalier was supposed to copy in his own handwriting as an affidavit vindicating Jones. After Chevalier had received these notes, he changed his story and took responsibility

7

for the offense.

Jones argues that he was not willfully attempting to obstruct justice or suborn perjury but was merely trying to persuade Chevalier to tell the truth. The evidence, however, supports the finding that Jones attempted to suborn perjury. Chevalier did not change his statement until after receiving the notes from Jones. The Secret Service agent investigating the crime testified that, in his opinion, the purpose of Jones's letters was unlawfully to influence Chevalier's testimony. Additionally, the presentence report ("PSR") recommended a two-level adjustment because of Jones's conduct.[3] Therefore, the district court did not clearly err in rejecting Jones's arguments and finding that his letters were an attempt to suborn perjury.

V.

Defendants contend that the district court erred in applying U.S.S.G. § 2B5.1(b)(2), resulting in an increase in their base offense level to 15. Under § 2B5.1(b)(2), the base level increases to 15 if the defendant "manufactured or produced any counterfeit obligation or . . . possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting . . . ."

A.

---

[3] *See United States v. Bermea,* 30 F.3d 1539, 1575 (5th Cir. 1994) ("[A] PSR generally bears sufficient indicia of reliability to be considered by the trial court as evidence in making the factual determinations required by the sentencing guidelines.").

Jones argues that the court erred because there was no evidence that he manufactured the counterfeit money, possessed any counterfeiting materials, or conspired to manufacture counterfeit currency. Brookins possessed counterfeit materials, and Chevalier admitted to making some of the counterfeit notes. Jones states, however, that there is no direct proof that he was in possession of materials to produce counterfeit currency or that he made counterfeit money. Thus, we must consider whether Jones's sentence can be increased because of his co-conspirators's conduct.

If a district court "fail[s] to expressly find that the defendant agreed to jointly undertake" a criminal activity, we should reverse any resulting enhancement as clear error. *See United States v. Dean*, 59 F.3d 1479, 1495 (5th Cir. 1995). As the *Dean* court went on to point out, a "court's finding of foreseeability is irrelevant without concurrent findings that [defendants] each agreed to a jointly undertaken criminal activity." *Id.* Therefore, if we agree with Jones that the district court failed to find him part of the "jointly undertaken activity" of manufacturing counterfeit currency, we cannot attribute to him the reasonably foreseeable conduct of his co-conspirators.

In *Dean*, the district court failed to make any finding that the defendants each agreed to a jointly undertaken criminal activity to carry additional amounts of crack cocaine. Following *United States v. Smith*, 13 F.3d 860 (5th Cir. 1994), the *Dean* court vacated the sentence enhancements and remanded for specific

9

findings on the "jointly undertaken activity."

Jones objected to his enhancement for manufacturing at the sentencing hearing, but the district court overruled this objection at trial and adopted the recommendations of the PSR without making its own specific findings. "[A] district court can adopt facts contained in a PSR without inquiry, if those facts ha[ve] an adequate evidentiary basis and the defendant does not present rebuttal evidence." *United States v. Lowder*, 148 F.3d 548, 552 (5th Cir. 1998). Therefore, the key inquiry is whether there is adequate evidence to support the finding that Jones agreed to participate in "the jointly undertaken activity" of *manufacturing* currency (rather than just *distributing* it).

The government has pointed to only one piece of evidence linking Jones to the *manufacturing* of the counterfeit currency: the conversation among Jones, Chevalier, and the government's witness Graham. Graham admitted that Jones and Chevalier never said they had already manufactured such currency. Instead, the conversation remained in hypothetical terms of how one might manufacture counterfeit currency. Additionally, Chevalier told officers that he and Brookins manufactured the currency, but he did not mention Jones's involvement.

The district court did not clearly err in holding Jones responsible for the jointly undertaken activity of manufacturing counterfeit currency. Graham's testimony supports the finding that Jones was aware of a plan to manufacture currency using a personal computer. Jones has not challenged the accuracy of Graham's

10

testimony or Graham's credibility as a witness. Jones's early involvement in discussions about manufacturing, when combined with his close relations with Brookins and Chevalier, supports the finding that Jones was part of a jointly undertaken activity to manufacture and distribute counterfeit currency.

Having found that Jones agreed to participate in a jointly undertaken activity, the district court also had to find that the actions of Jones's co-conspirators were reasonably foreseeable, because there is no evidence that Jones participated in the manufacturing process. Under § 1B1.3(a)(1)(B), one conspirator is liable (for sentencing purposes only) for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."

To determine a defendant's accountability for the conduct of others, "that conduct must be both 'reasonably foreseeable' to the defendant and within the scope of the defendant's agreement." *United States v. Carreon*, 11 F.3d 1225, 1230 (5th Cir. 1994); *see also* U.S.S.G § 1B1.3 commentary 4. District courts must make a specific factual finding that the defendant's conduct was reasonably foreseeable; as in the case of the "jointly undertaken activity", however, the finding of foreseeability can be met by adopting the facts contained in a PSR "if those facts ha[ve] an adequate evidentiary basis and the defendant does not present rebuttal evidence." *Lowder*, 148 F.3d at 552.

Jones's PSR recommended that the court increase his sentence pursuant to § 2B5.1(b)(2), and the court overruled his objection

and adopted the PSR.  In his brief, Jones does not make specific objections to the findings in the PSR.  Thus, his objections are inadequate.  *See Lowder*, 148 F.3d at 552 ("Mere objections do not suffice as competent rebuttal evidence.").   The PSR supports a finding that it was foreseeable to Jones that his co-conspirators were in possession of counterfeiting materials and manufactured counterfeit notes.  There is substantial evidence that defendants agreed to make and pass counterfeit currency.  Jones discussed with Chevalier the possibility of purchasing computer hardware to make counterfeit money, and together they passed counterfeit notes to their neighbors and to employees at two Texas Burger restaurants. Additionally, all three conspirators were found in possession of counterfeit bills with the same serial number, and there was evidence that all three frequently traveled together.

Accordingly, the district court did not clearly err in attributing to Jones the actions of his co-conspirators to manufacture counterfeit currency and in thereby enhancing his sentence pursuant to § 2B5.1(b)(2).  This is not a situation in which, on appeal, the court will be "left to 'second guess' the basis for the sentencing decision."  *Carreon*, 11 F.3d at 1231.

B.

Chevalier avers that there is no evidence tying him to the production of counterfeit money.  Given that Chevalier admitted to authorities that he photocopied the counterfeit notes, however, the district court did not clearly err in finding that he "manufactured

12

or produced" counterfeit currency.

Chevalier argues that the court erred in enhancing his base sentence because the term "materials" used in § 2B5.1(b)(2) does not include a paper cutter, straight edge, or razor and includes only items such as paper, ribbons, and ink. This argument also has no merit. A Secret Service agent testified that these items could be used to manufacture counterfeit bills, and Chevalier's own statement that he personally "cut the counterfeit . . . using a razor and a ruler" belies his assertion. Although this court has never expressly addressed the issue, no circuit has adopted Chevalier's argument.[4]

Chevalier contends that the court erred in enhancing his sentence because "(b)(2) does not apply to persons who merely photocopy notes or otherwise produce items that are so obviously counterfeit that they are unlikely to be accepted even if subjected to only minimal scrutiny." *See* U.S.S.G § 2B5.1(b)(2) commentary 4. Because Chevalier raises this issue for the first time on appeal, we review only for plain error. *See United States v. Ravitch*, 128 F.3d 865, 869 (5th Cir. 1997). To determine the quality of the counterfeit notes, we consider the following facts, none of which is dispositive:

> (1) physical inspection during the trial or at the sentencing hearing; (2) whether the counterfeit notes were successfully passed; (3) the number of counterfeit notes successfully passed; (4) the proportion of the

---

[4] *See e.g.*, *United States v. Miller*, 77 F.3d 71, 77 n.2 (4th Cir. 1996) (finding that possession of glue, scissors, paper, and green ink satisfied § 2B5.1(b)(2)); *United States v. Penson,* 993 F.2d 996, 997-98 (8th Cir. 1990) (finding that possession of a paper cutter satisfied § 2B5.1(b)(2)).

number of counterfeit notes successfully passed to the number of notes attempted to be passed; and (5) the testimony of a lay witness who accepted one or more of the counterfeit notes or an expert witness who testified as to the quality of the counterfeit notes.

*United States v. Wyjack*, 141 F.3d 181, 184 (5th Cir. 1998) (quoting *United States v. Miller*, 77 F.3d 71, 75-76 (4th Cir. 1996)). The counterfeit notes were not so obviously counterfeit as to be unacceptable. Several witnesses testified that they did not recognize the currency as counterfeit. Defense counsel argued to the jury that defendants did not know they possessed counterfeit money because it was a "darn good counterfeit bill" and that "many of the[] bills were passed" and "most people didn't recognize it as being counterfeit." So, the district court did not plainly or clearly err in enhancing Chevalier's sentence under § 2B5.1(b)(2).

VI.

Because we affirm the sentencing enhancements under § 2B5.1(b)(2) for manufacturing counterfeit currency and possessing materials to manufacture counterfeit currency, defendants' challenge to the sentencing enhancements for the $8,000 found with Brookins, even if successful, would not affect their sentences. Based on the § 2B5.1(b)(2) enhancements, both defendants will receive a base offense level of 15 no matter whether their enhancements for the $8,000 are affirmed. Therefore, we decline to consider the challenge to the enhancements.

AFFIRMED.

14